# Exhibit 5

©COPY

| | |
|---|---|
| 1 | SUPERIOR COURT OF THE STATE OF CALIFORNIA |
| 2 | FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER |
| 3 | DEPARTMENT 62 |
| 4 | |
| 5 | |
| 6 | KELLI PETERS, ET. AL.,          ) |
| 7 | PLAINTIFF,          ) |
| 8 | VS.          )     NO. 30-2012-00588580 |
| 9 | KENT W. EASTER, ET. AL.; AND ) DOES 1 TO 100, INCLUSIVE,          ) |
| 10 | |
| 11 | DEFENDANTS.          ) |
| 12 | |
| 13 | HONORABLE MICHAEL BRENNER, JUDGE PRESIDING |
| 14 | REPORTER'S TRANSCRIPT |
| 15 | FEBRUARY 4, 2016 |
| 16 | VOLUME III - PAGES 139 THROUGH 277 |
| 17 | |
| 18 | APPEARANCES OF COUNSEL: |
| 19 | FOR THE PLAINTIFF: |
| 20 | MARCEREAU & NAZIF BY:   ROBERT H. MARCEREAU |
| 21 | AND SY NAZIF |
| 22 | |
| 23 | FOR THE DEFENDANT KENT W. EASTER: |
| 24 | IN PRO PER BY:   KENT W. EASTER |
| 25 | |
| 26 | JEANETTE A. GILLICK, CSR NO. 7961 OFFICIAL COURT REPORTER |

1   (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT IN THE

2                     PRESENCE OF THE JURY:)

3

4        THE COURT:   COUNSEL, WE HAD NOT CONCLUDED WITH

5   MISS PETERS.  DO YOU HAVE A WITNESS YOU WANT TO CALL OUT OF

6   ORDER?

7        MR. MARCEREAU:   THAT'S CORRECT, YOUR HONOR.

8        PLAINTIFFS CALL OFFICER CHARLES SHAVER OUT OF

9   ORDER.

10        THE COURT:   ALL RIGHT.

11        THE CLERK:   RAISE YOUR RIGHT HAND.

12        DO YOU SOLEMNLY STATE THAT THE EVIDENCE YOU SHALL

13   GIVE IN THIS MATTER SHALL BE THE TRUTH, THE WHOLE TRUTH,

14   AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

15        THE WITNESS:   I DO.

16        THE CLERK:   PLEASE HAVE A SEAT AT THE WITNESS

17   STAND.  PLEASE STATE YOUR FIRST AND LAST NAME AND SPELL

18   BOTH FOR THE RECORD.

19        THE WITNESS:   CHARLES SHAVER, C-H-A-R-L-E-S,

20   S-H-A-V-E-R.

21        THE CLERK:   THANK YOU.  YOU MAY HAVE A SEAT IN THE

22   WITNESS STAND.

23

24                  DIRECT EXAMINATION

25   BY MR. MARCEREAU:

26     Q    GOOD MORNING.

1     A     GOOD MORNING.

2     Q     AS YOU MIGHT HAVE JUST IMPLIED TO THE JURY, ARE

3   YOU WITH THE IRVINE POLICE?

4     A     I AM.

5     Q     WHAT IS YOUR POSITION WITH THE IRVINE POLICE?

6     A     I AM A POLICE OFFICER.

7     Q     OFFICER SHAVER, ON FEBRUARY 16, 2011 DID YOU

8   RESPOND TO A CALL AT THE PLAZA VISTA ELEMENTARY SCHOOL?

9     A     YES, I DID.

10    Q     WHAT WAS THE NATURE OF THAT CALL?

11    A     A CALL CAME INTO THE POLICE DEPARTMENT STATING

12  THAT A WHITE PT CRUISER WAS DRIVING ERRATICALLY IN THE

13  PARKING LOT.  THAT THE CALLER THOUGHT THAT THE DRIVER HAD

14  MAYBE PUT SOME PILLS BEHIND THE SEAT, AND WE WERE CALLED TO

15  INVESTIGATE THAT BECAUSE THE CALLER WAS CONCERNED THAT

16  SOMEONE WAS DRIVING ERRATICALLY AND MAY POSSIBLY BE UNDER

17  THE INFLUENCE.

18    Q     IN AN ELEMENTARY SCHOOL PARKING LOT?

19    A     YES.

20    Q     WAS IT JUST YOU AND YOUR PARTNER THAT RESPONDED TO

21  THE CALL?

22    A     CORRECT.

23    Q     WHAT HAPPENED WHEN YOU ARRIVED AT THE PLAZA VISTA

24  ELEMENTARY SCHOOL?

25    A     FIRST THING WE DID WAS LOCATED THE CAR THAT WE

26  THOUGHT THE CALLER WAS DESCRIBING.  MY FOLLOW OFFICER,

1   OFFICER ROBERTS AND I APPROACHED THE DRIVER SIDE OF THE

2   WINDOW AND LOOKED IN THE AREA WHERE THE CALLER DESCRIBED

3   WHERE HE THOUGHT THIS BAG OF DRUGS WERE PLACED.  I LOOKED

4   THROUGH THE BACK OF THE WINDOW AND I SAW A LARGE BAG WHAT I

5   SUSPECTED WAS MARIJUANA PROTRUDING OUT OF THE SEAT POCKET

6   BEHIND THE DRIVER SEAT.

7       Q    WAS IT PRETTY OBVIOUSLY PROTRUDING OUT SO YOU CAN

8   SEE IT FROM OUTSIDE THE WINDOW?

9       A    CLEARLY.

10      Q    IN THIS CALL THAT CAME IN WERE YOU GIVEN THE

11  LICENSE NUMBER TO IDENTIFY THE CAR?

12      A    YES.  I DON'T KNOW IT OFF HAND.

13      Q    I WASN'T ASKING FOR THE LICENSE NUMBER.  THAT

14  WOULD HAVE BEEN PRETTY IMPRESSIVE IF YOU KNEW IT OFF THE

15  TOP OF YOUR HEAD.

16      A    I AM TRYING TO THINK IF THE CALLER HAD THE LICENSE

17  PLATE OR JUST THE DESCRIPTION OF THE PT CRUISER.  THE

18  CALLER STATED THAT HE THOUGHT THE DRIVER'S NAME WAS KELLI

19  AND SHE WAS A VOLUNTEER AT THE SCHOOL.  I DON'T KNOW IF THE

20  PLATE WAS PROVIDED.  IT WAS PRETTY EASY TO LOCATE THE CAR.

21  AFTER THE CAR WAS LOCATED, NOW THAT I THINK ABOUT IT, I

22  DON'T THINK THAT THE PLATE WAS GIVEN IN THE INITIAL CALL,

23  BUT ONCE WE FOUND THE VEHICLE I GAVE THE PLATE TO OUR

24  DISPATCH CENTER.

25      Q    WHEN YOU WENT TO THE CAR AND SAW THAT BAG OF LEAFY

26  GREEN SUBSTANCE PROTRUDING FROM THE BACK OF THE SEAT

1  POCKET, WHAT DID YOU DO AT THAT POINT?

2      A    AT THAT POINT WE POSITIONED OUR CARS WHEN WE FIRST

3  CAME IN BEHIND THE PT CRUISER AND I HAD OFFICER ROBERTS

4  STAY WITH THE CAR.  AFTER GETTING INFORMATION BACK FROM THE

5  DISPATCH CENTER WHO THE VEHICLE WAS REGISTERED TO USING THE

6  FIRST NAME THE CALLER PROVIDED, I WENT INSIDE TO TALK TO

7  THE ADMINISTRATIVE STAFF TO SEE IF THERE WAS SOMEONE

8  ACTUALLY THERE VOLUNTEERING AT THE SCHOOL.

9      Q    SO YOU ASKED THAT KELLI PETERS BE BROUGHT UP FRONT

10  TO SEE YOU?

11      A    I ASKED IF THERE WAS A KELLI PETERS THAT WAS

12  VOLUNTEERING THERE, AND THEY SAID SHE WAS AND ONE OF THE

13  STAFF WENT BACK TO GET WHERE SHE WAS AT WITHIN THE SCHOOL.

14      Q    AT SOME POINT DID KELLI PETERS APPEAR TO SPEAK

15  WITH YOU?

16      A    YES.

17      Q    WERE YOU IN YOUR UNIFORM AT THAT TIME?

18      A    I WAS.

19      Q    YOU HAD YOUR BADGE, YOUR GUN, RADIO, ALL OF THAT

20  STUFF?

21      A    YES.

22      Q    AND SO WHEN MRS. PETERS CAME UP TO YOU, WHAT DID

23  YOU OBSERVE AS FAR AS HER MINDSET IF ANYTHING?

24      A    INITIALLY I SAW THAT IT WAS A LONG HALLWAY AT THE

25  SCHOOL AND A FEMALE WAS RUNNING DOWN THAT LATER WAS

26  IDENTIFIED AS KELLI PETERS.  AT THE TIME SHE WAS RUNNING

1    DOWN SHE WAS PANICKED, AND BEFORE I COULD EVEN SAY ANYTHING

2    SHE ASKED WHAT HAPPENED TO MY HUSBAND OR IS MY HUSBAND ALL

3    RIGHT.  SHE THOUGHT THAT WAS THE NATURE OF ME BEING THERE

4    WAS.

5        Q    DID YOU EVER HAVE TO DELIVER BAD NEWS LIKE THAT?

6        A    YES.

7        Q    SO MRS. PETERS WAS ACTUALLY RUNNING TOWARDS YOU?

8        A    YES.

9        Q    SHE SEEMED DISTRAUGHT?

10       A    YES.

11       Q    SAYING, WHAT HAPPENED TO MY HUSBAND?

12       A    CORRECT.

13       Q    WAS SHE CRYING AT THAT POINT?

14       A    AT THAT POINT I DON'T THINK SHE WAS CRYING.  IT

15   WAS MORE PHYSICALLY A PANIC STATE.  I DON'T THINK THERE WAS

16   ANY TEARS AT THAT POINT.  AFTER SHE REALIZED NOTHING

17   HAPPENED TO HER HUSBAND, THEN THAT PANIC STARTED TO SUBSIDE

18   A LITTLE BIT.

19       Q    WHEN SHE INITIALLY ARRIVED AND SAID WHAT HAPPENED

20   TO MY HUSBAND, DID YOU THEN TRY TO CALM HER DOWN AND SAY,

21   NO, NO, THAT IS NOT WHAT WE ARE HERE FOR?

22       A    EXACTLY.

23       Q    ONCE YOU WERE ABLE TO ASSURE MRS. PETERS THIS

24   WASN'T ABOUT HER HUSBAND WHAT HAPPENED NEXT?

25       A    AT THAT POINT I ASKED HER TO STEP OUTSIDE, IF WE

26   COULD WALK OUT TO THE PARKING LOT.  AS I WAS OUTSIDE I

1  ASKED HER IF SHE HAD ANYTHING IN HER CAR THAT SHE SHOULDN'T

2  HAVE THAT WAS ILLEGAL, AND SHE SAID ABSOLUTELY NOT.

3      I LOOKED IN THE BACK OF THE CAR AND I THOUGHT I

4  SAW A BAG OF MARIJUANA.  SHE RESPONDED, THAT IS IMPOSSIBLE,

5  THERE CAN'T BE ANY MARIJUANA IN MY CAR.  I ASKED HER IF I

6  COULD SEARCH IT, AND SHE SAID ABSOLUTELY AND HANDED ME THE

7  KEYS.

8      Q    SHE WAS CONVINCED THERE IS NO POSSIBLE WAY THERE

9  COULD HAVE BEEN ANY DRUGS IN HER CAR?

10     A    YES, 100 PERCENT CONVINCED.

11     Q    DID YOU ESCORT MRS. PETERS TO HER CAR WHERE YOUR

12 PARTNER WAS PARKED BEHIND?

13     A    I DID.

14     Q    WHAT HAPPENED NEXT, OFFICER SHAVER?

15     A    WALKING INTO THE PARKING LOT GAVE ME A COUPLE

16 MINUTES JUST TO GET SOME FACTS.  SO I ASKED HER IF SHE WAS

17 THE ONLY ONE TO DRIVE THE CAR.  SHE SAID SHE WAS.  ASKED

18 HER IF SHE HAD BOTH SETS OF KEYS TO THE CAR.  SHE SAID SHE

19 DID.  ASKED HER IF THERE WERE ANY TEENAGERS IN THE HOUSE OR

20 DID SHE LOAN HER CAR OUT TO ANYBODY.  SHE SAID, NO, SHE IS

21 THE ONLY DRIVER OF THE VEHICLE.

22     Q    DID MRS. PETERS SEEM CONCERNED AT THIS POINT OR

23 CONVINCED THAT YOU HAD THE WRONG PERSON?

24     A    AT THIS POINT SHE WAS CONVINCED THERE WASN'T GOING

25 TO BE ANYTHING IN HER CAR.

26     Q    THEN WHAT HAPPENED WHEN YOU GOT TO HER CAR?

1    A    GOT TO THE CAR. I USED THE KEYS. UNLOCKED THE

2  FRONT DOOR AND OPENED UP THE BACK DRIVER'S DOOR AND PULLED

3  OUT THE BAG OF MARIJUANA.

4    Q    WHAT HAPPENED THEN?

5    A    AT THAT POINT PURE PANIC SET IN WITH MRS. PETERS.

6  A LOOK OF, THAT COULD NOT HAVE JUST COME OUT OF MY CAR

7  BECAUSE THEY ARE NOT MINE. SHE STARTED GETTING EMOTIONAL

8  SAYING, THAT IS NOT MY STUFF, NOT MINE. I DON'T KNOW WHERE

9  IT CAME FROM. I CONTINUED TO SEARCH THE CAR AND IN THAT

10  SAME POCKET BEHIND THE DRIVER SEAT I ALSO FOUND TWO ZIPLOCK

11  BAGS OF PILLS.

12    Q    NARCOTICS AS IT TURNED OUT?

13    A    ONE WAS VICODIN AND ONE WAS PERCOCET.

14    Q    DID YOU ALSO FIND A MARIJUANA PIPE?

15    A    THE PIPE WAS ACTUALLY INSIDE THE MARIJUANA BAG.

16  IN 25 YEARS OF LAW ENFORCEMENT PEOPLE DON'T STORE THEIR

17  WEED LIKE THAT. THEY DON'T DISPLAY IT IN THE CAR LIKE

18  THAT. SOMETHING WAS IN THE BACK OF MY MIND THAT I NEEDED

19  TO DIG A LITTLE FURTHER.

20    Q    SO MRS. PETERS AT THAT POINT WAS DISTRAUGHT?

21    A    YES.

22    Q    SHE IS SAYING THIS WASN'T MINE AND DENYING THESE

23  DRUGS WERE HERS AND NEVER SEEN THEM BEFORE?

24    A    EMPHATICALLY DENYING THAT.

25    Q    I IMAGINE AS A LAW ENFORCEMENT OFFICER YOU

26  PROBABLY HEAR THAT ALL THE TIME, THAT'S NOT MINE, COULDN'T

1 BE MINE?

2    A    A LOT OF TIMES, YES.

3    Q    AT THIS POINT WAS THERE SOMETHING IN THE BACK OF

4 YOUR MIND THAT SEEMED FISHY THOUGH BECAUSE THE WAY THE

5 DRUGS LOOKED FROM THE OUTSIDE OF THE VEHICLE?

6    A    IT NEEDED SOME INVESTIGATING.  I HAVE SEEN

7 STRANGER THINGS, BUT IT NEEDED FURTHER INVESTIGATING.

8    Q    SO WHEN YOU PULLED THESE DRUGS OUT OF THE BACK

9 SEAT POCKET, WHERE DID YOU PUT THEM?

10    A    AT THAT POINT I PUT THEM ON THE BACK OF MY MARKED

11 PATROL CAR.

12    Q    LAYING THEM OUT ON TOP OF THE CAR?

13    A    YES.

14    Q    WAS MRS. PETERS SAYING ANYTHING ABOUT THAT?  WAS

15 SHE WORRIED ABOUT YOU HAVING THE DRUGS OUT IN THE OPEN LIKE

16 THAT?

17    A    AT THAT POINT, YES, BUT I INSTRUCTED HER TO SIT ON

18 THE GROUND WHILE I COMPLETED THE SEARCH.  OFFICER ROBERTS

19 WAS THERE WATCHING OVER HER.  SHE CONTINUALLY DENIED THEY

20 ARE NOT MINE, OH, MY GOD, THEY ARE NOT MINE.  GOT VISIBLY

21 EMOTIONALLY UPSET, CRYING.

22    SHE WAS CONCERNED THE DRUGS WERE ON THE BACK OF

23 THE CAR.  SHE VOLUNTEERS.  AT THE TIME SHE WAS THE PTA

24 PRESIDENT.  CONCERNED THAT SCHOOL WAS LETTING OUT.  THAT

25 PARENTS, TEACHERS, STAFF MEMBERS OF THE SCHOOL WOULD SEE

26 THESE.  SHE WAS VERY CONCERNED ABOUT THAT.

1    Q    YOU INSTRUCTED HER TO SIT ON THE GROUND ON THE

2  CURB?

3    A    YES.

4    Q    SO SHE IS SITTING ON THE CURB WHILE THESE DRUGS

5  ARE BEING PULLED OUT AND LAID OUT ON THE CAR?

6    A    YES.

7    Q    AT THAT POINT EVEN THOUGH YOU THOUGHT MAYBE IN THE

8  BACK OF YOUR MIND SOMETHING IS FISHY YOU DIDN'T TELL

9  MRS. PETERS, I BELIEVE YOU ARE OFF THE HOOK AND YOU'RE IN

10  THE CLEAR?

11    A    NO.

12    Q    THAT WOULDN'T BE PROPER PROCEDURE?

13    A    NO.

14    Q    DO YOU REMEMBER ABOUT HOW LONG YOU ALL WERE

15  OUTSIDE IN THE PARKING LOT WHEN YOU WERE SEARCHING THROUGH

16  MRS. PETERS' CAR?

17    A    I WOULD PROBABLY SAY 30 TO 45 MINUTE IN THE

18  PARKING LOT.

19    Q    AT SOME POINT AFTER THAT 30 TO 45 MINUTES DID YOU

20  AND MRS. PETERS GO BACK INTO THE SCHOOL?

21    A    WE DID.

22    Q    SIR, AT THAT POINT WHEN YOU PULL THE DRUGS OUT OF

23  HER CAR IN RESPONSE TO A CALL THAT SHE HAD BEEN DRIVING

24  CRAZY IN THE PARKING LOT, WAS SHE FREE TO GO?

25    A    NO, ABSOLUTELY NOT.

26    Q    IF SHE WOULD HAVE TAKEN OFF RUNNING, YOU WOULD

1  HAVE CHASED AFTER HER?

2      A    YES.

3      Q    SO WHEN YOU WENT BACK TO THE SCHOOL, SHE WAS IN

4  YOUR CUSTODY?

5      A    SHE WAS, YES, BEING DETAINED.

6      Q    WHEN YOU WENT BACK TO THE SCHOOL, WHAT HAPPENED?

7      A    WENT BACK TO THE SCHOOL.  ASKED ONE OF THE

8  ADMINISTRATIVE STAFF IF THERE WAS AN OFFICE WE COULD USE.

9  STILL HAD TO DO SOME INVESTIGATION TO SEE IF THERE WAS EVEN

10 ANY ERRATIC DRIVING.  SO I NEEDED SOME QUESTIONS CLARIFIED.

11 THEY LET US USE AN OFFICE.  IT LOOKS LIKE A CONFERENCE ROOM

12 BEHIND THE MAIN ENTRANCE OF THE ELEMENTARY SCHOOL.

13     Q    I KNOW YOU WERE PROBABLY FOCUSED ON YOUR JOB, BUT

14 DID YOU COUNT HOW MANY PEOPLE WERE AROUND WHEN YOU CAME

15 BACK INTO THE SCHOOL AND TAKE NOTE OF EXACTLY WHO WAS

16 WHERE?

17     A    NO, THAT WAS NOT EVEN A THOUGHT OF MINE.

18     Q    THAT WASN'T YOUR FOCUS.  YOU WERE FOCUSSED ON

19 MRS. PETERS AND DOING YOUR JOB?

20     A    CORRECT.

21     Q    WHEN YOU WENT BACK INTO THE SCHOOL, DO YOU

22 REMEMBER WHETHER OR NOT YOU PERFORMED A FIELD SOBRIETY TEST

23 ON MRS. PETERS?

24     A    I DID.

25     Q    DOES THAT INCLUDE STUFF LIKE TAKING YOUR HAND AND

26 TOUCHING YOUR NOSE?

1    A    YES.

2    Q    WALKING, SAYING YOUR ABC'S?

3    A    NO ABC'S, BUT THAT IS ABOUT THE GIST OF IT.

4    Q    NOT THAT I HAVE EVER EXPERIENCED THAT.   OKAY.

5         MRS. PETERS, WHAT WAS HER MOOD LIKE AT THAT POINT

6    THAT YOU OBSERVED?

7    A    SHE WAS STILL PHYSICALLY EMOTIONALLY UPSET.   SHE

8    WAS STILL CONFESSING THAT THE DRUGS WERE NOT HERS.   AND SHE

9    HAD NO IDEA HOW THEY GOT THERE.   I BELIEVE AT ONE POINT I

10   ASKED A QUESTIONED, WELL, WHO COULD HAVE PUT THESE IN YOUR

11   CAR?   AND I THINK THAT IS WHEN IT WAS PROBABLY AFTER THE

12   FIELD SOBRIETY TESTS JUST TO MAKE SURE SHE WASN'T UNDER THE

13   INFLUENCE.

14        SO WE DID THE FINGER TO NOSE, THE WALK AND TURN,

15   AND THE ROMBERG TEST.   IT GAUGES YOUR ABILITY TO CALCULATE

16   30 SECONDS WITH YOUR HEAD CLOSED.   SOME DRUGS CAN SLOW THAT

17   DOWN WHERE 30 SECONDS TO SOMEBODY NOT UNDER THE INFLUENCE

18   IT COULD BE 3 MINUTES OR SPEED UP ON OTHER DRUGS.   IT COULD

19   BE 10 SECONDS AND YOU THINK 30 SECONDS HAS ELAPSED.   AFTER

20   HAVING GONE THROUGH THE FIELD SOBRIETY TESTS I DETERMINED

21   SHE WAS NOT UNDER THE INFLUENCE AT THE TIME.

22   Q    WAS SHE CRYING AT THIS POINT?

23   A    YES, HYSTERICALLY.

24   Q    DO YOU REMEMBER WHETHER AT ONE POINT MRS. PETERS'

25   DAUGHTER AND HUSBAND ARRIVED AT THE SCHOOL OR WERE AT THE

26   SCHOOL WITH HER?

1      A    SHE WAS VERY CONCERNED BECAUSE HER DAUGHTER WENT

2    TO THE SCHOOL AND IT WAS CLOSER TO THE END OF THE DAY AND

3    SHE USUALLY PICKS HER DAUGHTER UP FROM SCHOOL SINCE SHE IS

4    VOLUNTEERING THERE.  SO AT ONE POINT WE DID HAVE A

5    DISCUSSION ABOUT HER DAUGHTER.  I BELIEVE THE

6    ADMINISTRATIVE STAFF CALLED HER HUSBAND AND HE CAME DOWN TO

7    PICK UP HER DAUGHTER AFTER SCHOOL.

8      Q    DO YOU REMEMBER WHETHER OR NOT HER DAUGHTER WAS

9    AROUND WHEN YOU BROUGHT MRS. PETERS IN?

10           MRS. PETERS HAS TESTIFIED, AND TESTIFIED THAT HER

11   DAUGHTER WAS BROUGHT IN AND SAW IT.

12           MR. EASTER:  OBJECTION.

13           THE COURT:  REPHRASE IT.

14   BY MR. MARCEREAU:

15     Q    DO YOU REMEMBER WHETHER OR NOT MRS. PETERS'

16   DAUGHTER WAS ANYWHERE AROUND WHEN SHE WAS BROUGHT BACK INTO

17   THE SCHOOL?

18     A    I DO NOT.

19     Q    NOW, WHEN MRS. PETERS' HUSBAND CAME IN, WHAT WAS

20   HIS MOOD AND DEMEANOR IF YOU REMEMBER?

21     A    I DON'T REMEMBER HIM BEING EMOTIONAL OR CRYING OR

22   UPSET.  HE WAS JUST MORE KIND OF LIKE IN SHOCK.  DIDN'T

23   SEEM LIKE HE WAS PROCESSING WHAT I WAS TELLING HIM, THAT

24   THE DRUGS WERE FOUND IN HER CAR.  IT WAS LIKE THINGS JUST

25   WEREN'T MATCHING UP.

26     Q    OUT OF LEFT FIELD?

1        A     RIGHT.

2        Q     DID YOU QUESTION MR. PETERS TO TRY TO GET TO THE

3    BOTTOM OF WHETHER THOSE DRUGS COULD BE KELLI PETERS' OR

4    SOMEBODY IN HER FAMILY?

5        A     I DON'T REMEMBER IF AT THE SCHOOL OR BACK AT THE

6    HOUSE, BUT THERE WAS A TIME WE HAD A DISCUSSION.  THEY WERE

7    FOUND IN YOUR WIFE'S CAR, SHE SAYS SHE IS THE ONLY DRIVER

8    OF THE CAR, ANY IDEA WHERE THEY COULD HAVE COME FROM?  HE

9    DENIED THAT MRS. PETERS EVER DID DRUGS.  THERE WAS A POINT

10   THAT I ASKED MR. PETERS AS WELL, OKAY, WELL, CAN YOU THINK

11   OF ANYBODY THAT COULD HAVE DONE THIS?

12       Q     DID MRS. PETERS OR MR. PETERS IDENTIFY SOMEONE

13   THEY THOUGHT COULD HAVE DONE IT?

14       A     THEY DID.

15       Q     WHO DID SHE SAY?

16       A     THEY BOTH SAID JILL EASTER.

17       Q     AT THAT POINT DID YOU SAY, CASE CLOSED, IT MUST BE

18   JILL EASTER, YOU GUYS ARE OFF THE HOOK?

19       A     ABSOLUTELY NOT.

20       Q     DO YOU REMEMBER ABOUT HOW LONG YOU WERE AT THE

21   SCHOOL DETAINING MRS. PETERS INSIDE?  AND WE HAVE ALREADY

22   TALKED ABOUT THE PARKING LOT.  I AM TALKING ABOUT INSIDE.

23       A     PROBABLY ANOTHER 30, 45 MINUTES AS WELL.

24       Q     ARE YOU CERTAIN ABOUT THAT?  COULD HAVE BEEN A

25   LITTLE LONGER?

26           MR. EASTER:  OBJECTION, LEADING.

1          THE COURT:  OVERRULED.

2          THE WITNESS:  FIVE YEARS AGO.  IT COULD HAVE BEEN

3  A LITTLE LONGER.  I'M NOT SURE.

4  BY MR. MARCEREAU:

5      Q     HOW MANY CALLS DO YOU RESPOND TO IN A GIVEN DAY?

6      A     10 HOUR SHIFT, IT VARIES.  IT COULD GO ALL DAY

7  WITH NO CALLS OR 15 CALLS A DAY.  KIND OF DEPENDS.

8      Q     DID YOU HAVE A LOT OF CALLS IN THE LAST FIVE YEARS

9  SINCE YOU RESPONDED TO THIS ONE?

10     A     YES.

11     Q     THIS ONE STICKS OUT IN YOUR MEMORY THOUGH.  IT'S

12  UNIQUE, RIGHT?

13     A     IN 25 YEARS OF LAW ENFORCEMENT I HAVE NEVER SEEN

14  THIS.

15     Q     WHERE SOMEONE IS FRAMING SOMEONE ELSE FOR A CRIME

16  THEY DIDN'T COMMIT?

17     A     CORRECT.

18     Q     WHEN YOU FINISHED UP THE FIELD SOBRIETY TESTS AND

19  QUESTIONING MR. PETERS, WHAT HAPPENED THEN?

20     A     I WANTED TO GO BACK TO THE HOUSE AND SEARCH TO SEE

21  IF THERE WAS ANY MARIJUANA THERE, ANY PERCOCET, ANY

22  VICODIN, ANY RESEMBLANCE OF ANY CRIMINAL ACTIVITY.  THE

23  BAGS THAT THE PERCOCET AND VICODIN WERE IN WERE VERY

24  SPECIFIC.  IT WAS EITHER EZ LOCK OR EZL THAT HAD A DATE AND

25  TIME LIKE WHEN YOU TAKE MEDICATION YOU CAN PUT THEM IN THIS

26  POUCH AND REMEMBER WHEN TO TAKE IT.

KENT EASTER                183

1              THE COURT:  COUNSEL?

2              MR. MARCEREAU:  PLAINTIFF'S CALL DEFENDANT

3    KENT EASTER.

4              THE CLERK:  DO YOU SOLEMNLY STATE THAT THE

5    EVIDENCE YOU SHALL GIVE IN THIS MATTER SHALL BE THE TRUTH,

6    THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU

7    GOD?

8              THE WITNESS:  YES, I DO.

9              THE CLERK:  STATE AND SPELL YOUR NAME FOR THE

10   RECORD, PLEASE.

11             THE WITNESS:  KENT, K-E-N-T, EASTER, E-A-S-T-E-R.

12             THE CLERK:  THANK YOU.  HAVE A SEAT IN THE WITNESS

13   STAND, PLEASE.

14

15                    DIRECT EXAMINATION

16

17   BY MR. MARCEREAU:

18      Q    MR. EASTER, YOU HEARD OFFICER SHAVER TALK ABOUT A

19   CALL HE RECEIVED THAT PROMPTED HIS RESPONSE TO PLAZA VISTA

20   ELEMENTARY?

21      A    YES, I DID.

22      Q    YOU WERE THE ONE THAT MADE THAT CALL?

23      A    YES, I WAS.

24      Q    ON FEBRUARY 16, 2011 YOU MADE A CALL TO THE IRVINE

25   POLICE ABOUT KELLI PETERS?

26      A    YES.

1    Q     COULD YOU LOOK AT EXHIBIT 8 FOR ME.

2          ARE YOU THERE, SIR?

3    A     I AM.

4    Q     THIS IS A TRANSCRIPT OF THE CALL THAT YOU MADE TO

5    IRVINE POLICE, CORRECT?

6    A     YES, IT APPEARS SO.

7    Q     REMEMBER WE TALKED ABOUT THIS AT YOUR DEPOSITION

8    AND YOU READ THROUGH IT AND LISTENED TO YOUR VOICE ON THE

9    CALL AND CONFIRMED THAT WAS AN ACCURATE TRANSCRIPT?

10   A     THAT'S RIGHT.

11   Q     REMEMBER WE LISTENED TO THAT CALL?

12   A     YES.

13         MR. MARCEREAU:  YOUR HONOR, I WOULD LIKE TO

14   PUBLISH THE CALL.

15         THE COURT:  WHY DON'T YOU APPROACH FOR A MINUTE?

16         (SIDEBAR DISCUSSION OFF THE RECORD.)

17         (WHEREUPON THE AUDIO IS PLAYED IN OPEN COURT IN

18   THE PRESENCE OF THE JURY.)

19

20         DIRECT EXAMINATION (CONTINUED.)

21

22   BY MR. MARCEREAU:

23   Q     THAT WAS YOU ON THAT CALL?

24   A     YES.

25   Q     CORRECT ME IF I AM WRONG, BUT HALFWAY THROUGH THAT

26   CALL YOU STARTED USING A PHONY ACCENT, DIDN'T YOU?

1      A      YES.

2      Q      YOU GAVE THE POLICE A FAKE NAME VJ CHANDRASCKHR?

3             THE COURT:  ALL RIGHT.  THE CALL SPEAKS FOR

4      ITSELF, COUNSEL.

5      BY MR. MARCEREAU:

6      Q      EVERYTHING YOU SAID IN THAT CALL WAS A LIE?

7      A      PRETTY MUCH, YES.

8      Q      YOU DIDN'T USE YOUR CELL PHONE OR OFFICE PHONE TO

9      MAKE THAT CALL?

10     A      NO, I DID NOT.

11     Q      YOU WENT TO A HOTEL AND CALLED FROM A PUBLIC PHONE

12     IN THE BUSINESS CENTER?

13     A      THAT'S RIGHT.

14     Q      SO THAT IT WOULDN'T GET TRACED BACK TO YOU?

15     A      THAT'S CORRECT.

16     Q      TURN TO EXHIBIT 10, PLEASE.

17            THAT IS YOU IN SECURITY PHOTOS, SECURITY CAMERA

18     STILL PHOTOS OF THE HOTEL LOBBY?

19            MR. EASTER:  OBJECT, RELEVANCE.

20            THE COURT:  SUSTAINED.

21     BY MR. MARCEREAU:

22     Q      SIR, AROUND THE SAME TIME THAT THE DRUGS WERE

23     PLANTED IN KELLI PETERS' CAR AND THAT PHONY CALL WAS MADE

24     TO THE COPS YOUR WIFE WAS FINISHING UP A FANTASY NOVEL

25     ABOUT COMMITTING THE PERFECT CRIME?

26     A      NO.

```
 1      Q    SHE FINISHED IT UP A LITTLE EARLIER?

 2      A    I WOULD NOT DESCRIBE THE BOOK IN THAT WAY.

 3      Q    DIDN'T YOU DESCRIBE THE BOOK IN THAT WAY IN A

 4  VIDEO THAT YOU DID FOR THE BOOK?

 5      A    NO.  IT'S ACTUALLY ABOUT WHAT HAPPENS WHEN SOMEONE

 6  PLANS A PERFECT CRIME AND IT DOESN'T GO RIGHT.

 7      Q    DIDN'T YOU SAY IN A PROMOTIONAL VIDEO FOR YOUR

 8  WIFE'S NOVEL, IF YOU KNEW HOW TO COMMIT THE PERFECT CRIME,

 9  WOULD YOU DO IT?

10      A    THAT WAS THE TAG LINE OF THE AUDIO THAT WE WORKED

11  ON FOR PROMOTING HER BOOK ABOUT PEOPLE THAT TRY TO CARRY

12  OUT A PLAN AND IT BACKFIRES ON THEM AND FAILS IRONICALLY.

13      Q    THAT WAS YOUR VOICE WHEN YOU SAID THE WORDS, "IF

14  YOU KNEW HOW TO COMMIT A PERFECT CRIME, WOULD YOU DO IT?"

15           MR. EASTER:  OBJECTION, ARGUMENTATIVE.

16           THE COURT:  OVERRULED.  GO AHEAD AND ANSWER.

17           THE WITNESS:  OKAY.  YES, THAT WAS MY VOICE.

18  BY MR. MARCEREAU:

19      Q    YOU RELEASED THAT PROMOTIONAL VIDEO ON YOU TUBE

20  THE DAY AFTER YOU PLANTED THE DRUGS AND MADE THAT PHONY

21  CALL TO THE COPS AGAINST MRS. PETERS, DIDN'T YOU?

22      A    I DID NOT.

23      Q    WHY DON'T YOU TURN TO EXHIBIT 13 AND LET'S TAKE A

24  LOOK.

25           ARE YOU THERE, MR. EASTER?

26      A    I HAVE 13 AS A CD AND 13A AND 13B AS YOU TUBE.
```

1    Q    WHEN ALL THOSE THINGS FAILED YOU AND YOUR WIFE

2    THEN DECIDED TO PLANT DRUGS IN KELLI PETERS' CAR AND HAVE

3    HER ARRESTED?

4    A    NO.

5    Q    WHAT DID I GET WRONG?

6    A    THERE WAS A LARGE PERIOD OF TIME WHERE NOTHING

7    HAPPENED.

8    Q    THAT WAS THE PLANNING PHASE.  THAT IS WHEN YOU

9    WERE PLOTTING THE PERFECT CRIME, RIGHT?

10    A    NO.

11    Q    SO WHEN ALL THOSE PREVIOUS EFFORTS FAILED, AT SOME

12    POINT LATER ON A FEW MONTHS LATER YOU AND YOUR WIFE

13    CONSPIRED TO AND DID PLANT DRUGS IN KELLI PETERS' CAR AND

14    TRIED TO HAVE HER FRAMED FOR CRIMES SHE DIDN'T COMMIT?

15    A    YES.  VERY STUPIDLY AND VERY UNFORTUNATELY, YES.

16    Q    SIR, ARE YOU NOW ADMITTING THAT YOU KNOWINGLY

17    PARTICIPATED IN A SCHEME WITH YOUR WIFE TO FRAME

18    KELLI PETERS?

19        THE COURT:  I THINK THERE IS A STIPULATION TO THAT

20    AS I UNDERSTAND IT.

21        MR. EASTER:  OBJECTION, RELEVANCE.

22    BY MR. MARCEREAU:

23    Q    MR. EASTER, I HEARD YOU SAY IN YOUR OPENING

24    STATEMENT, I ACCEPT RESPONSIBILITY.

25        DO YOU REMEMBER SAYING THAT?

26    A    YES.

194

1      A    YES, I USED TO BE A LAWYER.

2      Q    BECAUSE OF NARCOTICS IN THE CAR MRS. PETERS WAS

3    FACING UP TO THREE YEARS IN PRISON, WASN'T SHE?

4      A    I DO NOT KNOW.  I AM NOT A CRIMINAL ATTORNEY AND I

5    NEVER RESEARCHED IT.

6      Q    THE FACT THE CALL WAS ABOUT IT BEING ON SCHOOL

7    GROUNDS THAT MADE IT AN EVEN BIGGER OFFENSE, DIDN'T IT?

8      A    I DON'T KNOW.

9      Q    YOU DIDN'T CONSIDER ANY OF THIS BEFORE YOU WENT

10   THROUGH WITH YOUR PLAN?

11     A    CORRECT.

12     Q    SIR, IF THE POLICE BOUGHT YOUR STORY THAT YOU TOLD

13   THEM THAT MRS. PETERS WAS DRIVING CRAZY AROUND THE SCHOOL

14   PARKING LOT, SHE WAS ALSO LOOKING AT CHARGES FOR CHILD

15   ENDANGERMENT, WASN'T SHE?

16     A    I DON'T KNOW.

17     Q    YOUR WIFE WAS A LAWYER AS WELL, CORRECT?

18     A    SHE WAS A CORPORATE ATTORNEY FOR 3 1/2 YEARS.

19     Q    SIR, YOU KNEW IF YOUR PLAN SUCCEEDED FULLY,

20   MRS. PETERS WAS FACING YEARS IN PRISON, WASN'T SHE?

21     A    I DON'T KNOW.

22     Q    DIDN'T THINK ABOUT THAT BEFORE YOU DID IT?

23     A    NO.

24     Q    DID YOUR WIFE THINK ABOUT IT BEFORE SHE DID IT?

25     A    I DON'T KNOW.

26     Q    THIS HAS BEEN ESTABLISHED.  YOU WERE CONVICTED FOR

1    FRAMING KELLI PETERS, CORRECT?

2        A    CORRECT.

3        Q    YOU SERVED A GRAND TOTAL OF 87 DAYS IN JAIL,

4    CORRECT?

5        A    YES.

6        Q    ISN'T IT TRUE, SIR, WHEN YOU WERE SENTENCED THE

7    JUDGE TOLD YOU HE WISHED HE COULD HAVE GIVEN YOU A WHOLE

8    LOT MORE TIME?

9            THE COURT:  SUSTAINED.

10   BY MR. MARCEREAU:

11       Q    YOUR WIFE JILL EASTER SERVED A GRAND TOTAL OF 60

12   DAYS IN JAIL, DIDN'T SHE?

13       A    THAT SOUNDS RIGHT.

14       Q    SIR, CAN YOU TURN TO EXHIBIT 14.  THIS IS A COPY

15   OF THE PLEA AGREEMENT SIGNED BY YOUR WIFE.

16           HAVE YOU SEEN THIS BEFORE?

17       A    YES, I HAVE.

18       Q    COULD YOU LOOK AT THE LAST PAGE.

19           ARE YOU THERE?

20       A    YES.

21       Q    DO YOU RECOGNIZE THAT AS YOUR WIFE'S SIGNATURE?

22       A    YES.

23       Q    THAT IS YOUR WIFE'S SIGNATURE?

24       A    YES.

25       Q    IF YOU TURN TO THE SECOND TO THE LAST PAGE THERE

26   IS ANOTHER SIGNATURE LINE THERE.

1    REPORTER'S CERTIFICATE

2

3

4         I, JEANETTE A. GILLICK, CSR NO. 7961, OFFICIAL

5    COURT REPORTER IN AND FOR THE SUPERIOR COURT OF THE STATE

6    OF CALIFORNIA, COUNTY OF ORANGE, DO HEREBY CERTIFY THAT THE

7    FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF MY

8    SHORTHAND NOTES, AND IS A FULL, TRUE AND CORRECT STATEMENT

9    OF THE PROCEEDINGS HAD IN SAID CAUSE.

10        DATED THIS _24th_ DAY OF _February_ , 2016.

11

12

13                    _____

14         JEANETTE A. GILLICK, CSR NO. 7961
                OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

26